UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **APPRILL WALDEN**, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 15-cv-1034 (TSC) |
| **PATIENT-CENTERED OUTCOMES RESEARCH INSTITUTE**, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff Apprill Walden alleges that her former employer, Defendant Patient-Centered Outcomes Research Institute ("PCORI"), violated the District of Columbia Human Rights Act ("DCHRA"), D.C Code § 2-1401.0, *et seq.*, by discriminating and retaliating against her, creating a hostile work environment, and deliberately making working conditions so intolerable that she was forced to resign. Defendant denies these allegations and moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons stated herein, Defendant's motion is GRANTED in part and DENIED in part.

**I.     BACKGROUND[1]**

PCORI hired Plaintiff on May 19, 2014 for the position of Senior Media Relations Specialist. (Compl. ¶ 8). In this role, Plaintiff reported directly to Christine Stencel, the

---

[1] The court will, as it must on a motion under Rule 12(b)(6), assume the allegations in the Complaint to be true and views the facts in the light most favorable to the Plaintiff.

1

Associate Director for Media Relations. (*Id.*). During Plaintiff's first few months in this position, Stencel praised her "performance and work ethic." (*Id.* ¶ 11).

On June 10, 2014, Plaintiff suffered a serious spinal injury in a car accident. (*Id.* ¶ 12). Her injury caused her "severe neck, shoulder and back pain, headaches, dizziness and difficulty sleeping," and affected her ability to walk, bend, sit, lift, and stand. (*Id.* ¶¶ 13-14). On June 13, 2014, she began to see an orthopedic specialist, Dr. Richard Meyer, who ordered her to undergo physical therapy. (*Id.* ¶ 15). After the accident, Plaintiff informed Stencel that she would need reasonable accommodations for her disability; however, starting in August 2014, Plaintiff's work schedule forced her to miss physical therapy appointments. (*Id.* ¶¶ 16-17).

In October 2014, Dr. Meyer filled out a "PCORI Request for Medical Information Related to Request for Workplace Accommodation," which was given to Mitch Eisman, PCORI's Director for Human Resources and Administration. (*Id.* ¶¶ 18-19; Def. Reply Ex. B). In the form, Dr. Meyer noted that Plaintiff could not perform all of the essential functions and duties of her position without reasonable accommodations, and recommended that Plaintiff work from home for three days per week for at least eight weeks and be provided with an ergonomic work chair with lumbar and cervical support as a corrective device. (*Id.* ¶ 19). Meyer checked "No" next to the question "Do any of the impairment(s) identified in Question 3 substantially limit the employee's ability to perform any major life activities other than working (e.g. caring for one's self, performing manual tasks, walking, seeing, hearing . . . etc.)." (Def. Reply, Ex. B at 3).

In or around October 2014, Plaintiff met with Eisman and Stencel to work out a reasonable accommodation arrangement, and, despite her doctor's recommendation, Plaintiff agreed to work from home only twice per week. (*Id.* ¶ 20). At the meeting, Plaintiff voiced

...

concerns about her workload and Stencel's negative treatment; specifically, that Stencel was unsupportive and ignored her calls or emails asking for time off to attend medical appointments. (*Id*. ¶¶ 21-22).  Neither Eisman nor anyone else in the human resources department addressed Plaintiff's concerns.  (*Id*. ¶ 23).

After the parties reached a work-from-home agreement in November 2014, Stencel refused to complete the supervisory portion of the agreement unless Plaintiff attended a one-on-one meeting with her, without any HR personnel present.  (*Id*. ¶ 24).  At the meeting, Plaintiff asked Stencel about her performance, and Stencel told her that it was "fine and reliable thus far." (*Id*. ¶¶ 25-26).  But after the meeting, Stencel began assigning Plaintiff an overwhelming amount of work, with unclear instructions on priorities and deadlines, while demanding perfection.  (*Id*. ¶ 28).  Plaintiff "initiated conversations about her workload" with Stencel on multiple occasions, but nothing was done to address her concerns, and Plaintiff was forced to miss additional physical therapy appointments, thereby slowing her recovery.  (*Id*. ¶¶ 29-30).  Indeed, Stencel encouraged Plaintiff to skip physical therapy, had her stay late on days when Stencel knew Plaintiff had physical therapy, and on multiple occasions, ignored or refused to approve Plaintiff's requests for paid time off.  (*Id*. ¶¶ 31-32).

On January 16, 2015, Stencel had Plaintiff conduct a six month review of her own performance, despite the fact that only annual reviews were required of employees, and no other employees had done or heard of such a review.  (*Id.* ¶ 33).  Then, on February 25, 2015, Plaintiff received an appraisal report in which Stencel, in a departure from her prior positive comments, criticized Plaintiff for absenteeism and required her to conform to a Performance Improvement Plan ("PIP").  (*Id*. ¶¶ 34-36).  The PIP, along with her regularly assigned duties, created an unreasonable amount of work for Plaintiff that was greater than her initial workload, and which

she could not handle. (*Id*. ¶ 37). Knowing she could not meet its terms and conditions, in March 2015 Plaintiff refused to sign the PIP and was subsequently "forced to resign involuntarily" because her situation had become "unbearable." (*Id*. ¶¶ 38-39). Following Plaintiff's resignation, Stencel posted two advertisements for positions on the PCORI website—Media Relations Specialist and Senior Media Relations Specialist—whose combined duties equaled the responsibilities set forth in Plaintiff's PIP. (*Id*. ¶ 40). Plaintiff then brought this suit, alleging four violations of the DCHRA.

## II.   LEGAL STANDARD

A motion to dismiss under FED. R. CIV. P. 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). A claim is plausible when the factual content allows the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (quotation marks and citation omitted). Evaluating a 12(b)(6) motion is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The reviewing court may "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.   ANALYSIS

#### A.  Disparate Treatment Based on Disability (Count I)

Under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), in order to make out a prima facie case of discrimination in violation of the ADA or the DCHRA, a plaintiff must show that she was disabled within the meaning of the ADA, she was qualified for the position at issue with or without a reasonable accommodation, and she suffered an adverse employment action because of her disability. [2] *Giles v. Transit Emp. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) cert. denied, No. 15-7174, 2016 WL 763407 (U.S. Feb. 29, 2016).  However, at the motion to dismiss stage a "Plaintiff need only allege that he 'suffered an adverse employment action . . . because of [his] race, color, religion, sex, national origin . . . or disability.'"  *Munro v. LaHood,* 839 F. Supp. 2d 354, 361 (D.D.C. 2012) (citation omitted).

Plaintiff alleges that she suffers from a spinal cord injury that causes severe pain and affects her "major life activities of walking, bending, sitting, lifting, and standing."  (*Id*. ¶14). Her injury requires her to attend physical therapy and to occasionally work from home.  (*Id*. ¶¶ 15, 19).  These allegations suffice to state a claim for a disability under the DCHRA.  *See Massaquoi v. Dist. of Columbia*, 81 F. Supp. 3d 44, 55 (D.D.C. 2015) (citing 42 U.S.C. § 12102(2)(A)) ("The ADA provides a nonexhaustive list of 'major life activities,' including 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,

---

[2] Because their prohibitions are similar, "[w]hen evaluating claims brought under the DCHRA, 'decisions construing the ADA [are considered] persuasive.'"  *Giles,* 794 F.3d at 5 (citing *Grant v. May Dept. Stores Co*., 786 A.2d 580, 583–84 (D.C. 2001)).  The same is true for discrimination claims under Title VII and the DCHRA: "The legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII." *Elhusseini v. Compass Grp. USA, Inc*., 578 F. Supp. 2d 6, 18 (D.D.C. 2008).

communicating, and working.'"). The court does not find the fact that Dr. Meyer checked "No" regarding whether Plaintiff's injuries substantially affected her major life activities to be dispositive on this issue, given his findings that she was unable to perform her job duties without accommodation.

The court also finds that although Plaintiff's complaint is meager, she has pled sufficient factual allegations to allow the court draw the reasonable inference that she suffered an adverse employment action. To demonstrate an adverse employment action, a plaintiff must point to "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citing *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, (1998)). To be significant, a change must have "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id*. (citing *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). If an alleged employment action does "not clearly result in a significant change in employment status, an employee must '[demonstrate] how the decision nonetheless caused such an objectively tangible harm.'" *Wilson v. Mabus*, 65 F. Supp. 3d 127, 133 (D.D.C. 2014) (quoting *Douglas*, 559 F.3d at 553), appeal dismissed (Mar. 19, 2015). "A tangible employment action in most cases inflicts direct economic harm," *Douglas*, 559 F.3d at 552 (citing *Burlington Indus.*, 524 U.S. at 762), such as decreasing an employee's grade or salary. *Taylor*, 350 F.3d at 1293.

Plaintiff alleges that she was subjected to a six-month performance evaluation that no other employees were required to undergo, received a negative performance review (despite

6

receiving previous positive evaluations), and that the combination of a negative performance evaluation with the new workload required by the PIP forced her to involuntarily resign. (Pl. Resp. at 9).

The parties agree that receiving a negative performance evaluation, or being assigned a PIP, standing alone, does not amount to an adverse employment action. (*Id*.; Def. Mot. to Dismiss at 6). Additionally, the cases upon which Plaintiff relies are inapposite because they involve retaliation claims, which are assessed under a different standard. "Adverse actions in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n. 4 (D.C. Cir. 2008).

However, "courts have specifically recognized that when PIP placement and negative performance feedback" result in injuries such as losses of salary, benefits, and entitlements, these actions meet the threshold for an adverse employment action. *Munro*, 839 F. Supp. 2d at 362. Here, Plaintiff alleges that the combination of the negative performance review and the PIP led to a significant increase in her responsibilities that substantially increased her workload and changed her job requirements, forcing her to leave her position and lose her salary. (Compl. ¶¶ 36-39). The court finds that this is sufficient at this stage to state a claim for disparate treatment, although Plaintiff may have several hurdles to overcome to survive further dispositive motions. Defendant's motion to dismiss Count I is therefore denied.

### B. Retaliation (Count II)

"To establish a prima facie case of retaliation, plaintiff must show: (1) that she engaged in protected activity; (2) that she was subjected to adverse action by the employer; and (3) that there existed a causal link between the adverse action and the protected activity." *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 36 (D.D.C. 2007). "A plaintiff alleging retaliation faces a low

hurdle at the motion to dismiss stage, and need not present evidence of pretext." *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010).

Plaintiff argues that (i) her request for accommodation, her complaints to Stencel and Eisman regarding her workload, and Stencel's unsupportive attitude constituted protected activity; (ii) the negative performance evaluation and PIP, together with the increased workload, missing physical therapy, and issues with getting paid time off constituted an adverse employment action; and (iii) there was sufficient temporal proximity between Stencel approving her accommodation request (which was conditioned on a meeting without HR present), increasing her workload, then giving her a negative review and a PIP to establish a causal link. Mindful of the Supreme Court's admonition that the allegations need only be "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, the court finds that Plaintiff has pled sufficient factual allegations to state a claim for retaliation by showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (citing *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006)).

"It is clear that requesting a reasonable accommodation for a disability is a protected activity under the ADA." *Schmidt v. Solis*, 891 F. Supp. 2d 72, 93 (D.D.C. 2012) (citing 42 U.S.C. § 12112(b)(5)(A)). Here, Plaintiff alleges that, following her injury, she requested a reasonable accommodation, and complained to Stencel and Eisman about her workload and Stencel's unsupportive attitude. (Comp. ¶¶ 20-22). This is sufficient to establish that Plaintiff engaged in protected activity under the ADA.

Plaintiff also pleads sufficient facts to make out an adverse employment action at this stage: the combined effect of the PIP and negative performance evaluation, as well as a significantly increased workload. In *Paschal v. Dist. of Columbia*, 65 F. Supp. 3d 172 (D.D.C. 2014), the court found that a PIP and negative performance evaluation constituted an adverse employment action:

> Plaintiff alleges that Defendant gave him both a negative performance rating and placed him on a PIP for the performance period that ran from October 2011 to September 2012. Plaintiff further alleges that the "negative performance evaluation and the PIP exposed [him] to [potential] removal or reassignment, and they had a detrimental effect on his responsibilities and promotion opportunities." Defendant's alleged actions . . . qualify as materially adverse actions.

*Id.* at 178. Similarly, as Plaintiff points out, the D.C. Circuit has held that significantly increasing an employee's workload may support a retaliation claim. *See Mogenhan*, 613 F.3d at 1166 ("A reasonable employee might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work.").

Finally, Plaintiff has alleged sufficient temporal proximity between her request for accommodation and Defendant's alleged retaliatory acts. "For purposes of establishing a prima facie case of retaliation, '[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.'" *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (citation omitted). In *Hamilton*, the D.C. Circuit found a gap of just under three months between a protected action and a retaliatory act sufficient to establish temporal proximity causation. *Id.* at 1359. Here, there is a similar gap of approximately three months between Plaintiff's meeting with Stencel and Eisman and when she received the negative performance evaluation and PIP, and the court finds that that is sufficient to establish temporal proximity.

Having found that Plaintiff has alleged sufficient facts to state a claim for Retaliation, the court will deny Defendant's motion to dismiss Count II.

### C.  Hostile Work Environment (Count III)

In order to establish a hostile work environment claim, a plaintiff must show that (1) she is a member of a protected class; (2) she endured harassment that was severe or pervasive such that it altered a term, condition, or privilege of employment; and (3) the harassment was based on her membership in the protected class.  *Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 86 (D.D.C. 2014) (citations omitted).  "A hostile work environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Winston*, 712 F. Supp. 2d at 12. (quoting *Roberson v. Snow*, 404 F. Supp. 2d 79, 97 n. 8 (D.D.C. 2005)).  In determining if such an environment exists, "the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d at 1201.  These hostile acts "must be adequately connected to each other . . . as opposed to being an array of unrelated discriminatory or retaliatory acts." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

Plaintiff's allegations—which are the same ones upon which her disparate treatment and retaliation claims are based—fail to support her hostile work environment claim because they do not show that she was subjected to the kind of "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  As Defendant correctly notes, "'as a general matter' courts in this Circuit 'frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim.'" *Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013) (quoting *Baloch*

*v. Norton*, 517 F.Supp.2d 345, 364 (D.D.C.2007). "Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003). Plaintiff's Complaint runs aground on this problem.

Even if the court were to consider the same allegations upon which Plaintiff relies for her disparate treatment and retaliation claims in assessing her hostile work environment claim, the allegations would fall short of what is required. Plaintiff simply does not allege the type of "intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions" of her employment. *Winston*, 712 F. Supp. 2d at 12*; see also Munro*, 839 F. Supp. 2d at 366 (the very nature of hostile work environment claims under Title VII involves repeated conduct). And while Plaintiff is correct that severity can counterbalance a lack of pervasiveness, *see Baloch v. Norton*, 355 F. Supp. 2d 246, 260 (D.D.C. 2005) ("severity can in essence compensate for a lack of pervasiveness, despite the fact that isolated or occasional episodes rarely merit relief"), the conduct alleged in this case is not so severe. In a hostile work environment claim, the "'conduct must be extreme to amount to a change in the terms and conditions of employment,'" *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Here, Plaintiff merely reiterates the same factual allegations upon which her first two counts are based, and states in conclusory fashion that she "suffered mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain, mental shock, depression, damage to her personal and professional reputation . . ." (Compl. ¶ 61). The court finds that this is insufficient to establish the extreme conduct required.

Plaintiff's reliance on the PIP and negative performance evaluation are similarly misplaced. "'Criticisms of . . . work and expressions of disapproval (even loud expressions of disapproval)' are not sufficiently severe to constitute a hostile work environment." *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 7 (D.D.C. 2012) aff'd, 748 F.3d 1273 (D.C. Cir. 2014) (quoting *Singh v. U.S. House of Representatives*, 300 F.Supp.2d 48, 56 (D.D.C. 2004)); *see also Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F.Supp.2d 76, 110–11 (D.D.C. 2011) ("courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors.").

In *Munro v. LaHood*, 839 F. Supp. 2d 354 (D.D.C. 2012), the plaintiff claimed the defendant subjected him to discrimination, retaliation, and a hostile work environment because of his gender and disability. *Id.,* at 366. In support of this claim, he reiterated the same factual allegations underlying his discrimination and retaliation claims, namely that his supervisors placed him on a PIP, gave him distorted performance feedback that was unfavorable, told him he could not submit any more assignments, yelled at him during a meeting about his PIP, and placed him on an extended Performance Opportunity Period upon failure to complete his PIP. *Id.* at 361. The court found that while plaintiff's allegations were sufficient to survive a motion to dismiss as to the disparate treatment and retaliation claims, they did not make out a sufficient claim for hostile work environment because plaintiff did not establish that these discrete acts were sufficiently severe or pervasive. *Id.*, at 366. Plaintiff's hostile work environment claim fails for the same reasons, and the court will therefore grant Defendant's motion to dismiss Count III.

### D. Constructive Discharge (Count IV)

"[A] constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." *Katradis v. Dav–El of*

*Wash.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988) (citing *Hopkins v. Price Waterhouse*, 825 F.2d 458, 472 (D.C. Cir. 1987)). To allege constructive discharge, a plaintiff must show "that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 102 (D.D.C. 2011) (citing *Lewis v. Dist. of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C. 2009)). "Circuit law is clear that a 'finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee' out." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981)). "'The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?' This showing requires 'something more' than, say, a hostile work environment claim alone." *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). "The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination." *Id.* (citing *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006)).

Plaintiff argues that she faced intentional discrimination from Stencel, who deliberately made her working conditions intolerable, and aggravating factors justified Plaintiff resigning from her position. (Pl. Resp. at 25-27). Plaintiff did not allege aggravating factors in her Complaint, but argues in her Response that she was given a specific time frame in which to sign the PIP or suffer consequences, and remediation was never an option. (*Id*. at 27).

Even accepting the allegations proffered in Plaintiff's Response, receiving a negative performance evaluation, having to conform to a PIP, and being given a specific time frame in which to sign the PIP are not so harsh that they rise to the level of aggravating factors which would justify Plaintiff's conclusion that she had to resign.  "Aggravating factors are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." *Floyd v. Lee*, 85 F. Supp. 3d 482, 521  (D.D.C. 2015).  "[A]ggravating factors can include 'historic discrimination' over a period of several years,' 'repeated but futile attempts' to remedy the discrimination, and 'humiliation and loss of prestige' precipitated by the failure to obtain redress."  *Id.* (quoting *Clark,* 665 F.2d at 1175–76).  Plaintiff does not plead any such extreme conduct.

Moreover, while the Complaint alleges that "Defendant intentional [*sic*] discriminated against Ms. Walden, deliberately making her working conditions so intolerable that it forced her to resign" (Comp. ¶ 65), she does not plead any facts stating what it was that Defendant did to make her working conditions intolerable, nor does she specify how or why she was forced to resign.  As with her hostile work environment claim, Plaintiff cannot merely rest on the same factual pleadings upon which her disparate treatment and retaliation claims are based.  Given that the court has found that she has failed to plead sufficient facts to make out a hostile work environment claim, logic compels the finding that she has not sufficiently pleaded a constructive discharge claim.  *See Floyd*, 85 F. Supp. 3d at 522 ("the Court has already concluded that the evidence could not support a finding either of a hostile work environment . . . [l]ogically then, this same evidence cannot satisfy the even more demanding requirement that conditions were 'so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]'").  The court therefore grants Defendant's motion to dismiss Count IV.

## IV.	CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED as to Counts III and IV and DENIED as to Counts I and II.

A corresponding order will issue separately.

Dated: March 31, 2016.

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge