# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPRILL WALDEN,

       *Plaintiff*,

v.

PATIENT-CENTERED OUTCOMES
RESEARCH INSTITUTE,

       *Defendant*.

Civil Action No. 15-1034 (TJK)

## MEMORANDUM OPINION

Plaintiff Apprill Walden alleges that her former employer, Defendant Patient-Centered Outcomes Research Institute ("PCORI"), violated the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, by discriminating against her on the basis of her disability and retaliating against her after she requested accommodations for that disability, a protected activity under the statute. ECF No. 1 ("Compl."); ECF No. 26 ("Opp."). PCORI denies these allegations and moves for summary judgment. ECF No. 23 ("Mot."). For the reasons set forth below, PCORI's motion will be granted.

## I. Background

### A. Factual Background

PCORI is an independent, non-profit organization established by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010). Mot., Statement of Undisputed Material Facts ("Def.'s SOF") ¶ 1. The organization's mission is to help patients, clinicians, and others make informed health care decisions by, among other things, funding "patient-centered comparative clinical effectiveness research" and disseminating the results of that research to the public. *Id.* ¶ 2. PCORI's in-house communications department is

responsible for publishing research results, interfacing with the media, and keeping the organization's staff members apprised of any relevant news. *Id.* ¶ 4; ECF No. 23-1 ("Stencel Decl.") ¶ 7.

In May 2014, PCORI hired Walden to serve as the communications department's "Senior Media Relations Specialist," a position it created to reduce the amount of work it typically outsourced to an external communications firm. Def.'s SOF ¶¶ 7-8. The position's responsibilities included assisting in the day-to-day management of media relations activities, responding to press inquiries, preparing staff for interviews, and monitoring news coverage. *Id.* ¶ 14; ECF No. 26-1 ("Walden Dep.") at 24-25. The position paid an annual salary of $75,000. Def.'s SOF ¶ 9. Walden was expected to "complete assignments with sufficient levels of accuracy on or before deadlines." Stencel Decl. ¶ 125. As a full-time employee, she was entitled to 240 hours of paid time off ("PTO") per year, accruing semi-monthly, to use on vacation, sick leave, medical appointments, or for other reasons. Def.'s SOF ¶¶ 16-17.

In June 2014, prior to starting her job at PCORI, Walden was involved in a car accident, resulting in injuries to her neck, back, and spine. Opp., Statement of Disputed Facts ("Pl.'s SOF") ¶ 2. These injuries limited her ability to "work, walk, stand, drive and sit for long periods." *Id.* After starting work on June 16, 2014, Walden informed her direct supervisor, Christine Stencel, that she needed to attend regular medical appointments and physical therapy sessions as part of her rehabilitation. Walden Dep. at 43-44; Def.'s SOF ¶¶ 10, 12. During Walden's first two weeks, Stencel allowed her time off to attend medical appointments and to move into a new apartment, despite the fact that she had not yet accrued any PTO. Def.'s SOF ¶¶ 21-22.

From June through November 2014, Walden took time off to go to medical appointments and physical therapy sessions. *Id.* ¶¶ 29, 31. During this time period, according to her medical records, she attended at least twenty-four such sessions. *Id.*; ECF No. 28 ("Pl.'s Med. Rec.") at 29-30, 33-34, 36-39, 41, 43-44. But Walden asserts that Stencel occasionally denied her requests to use PTO to attend to these matters. Pl.'s SOF ¶ 10. Stencel claims that Walden was often given permission to leave for medical reasons during normal working hours without having to use her PTO. Def.'s SOF ¶¶ 29-30. Stencel also claims that she made "every effort" to grant Walden's requests for PTO, whether her reasons were medical or non-medical. Stencel Decl. ¶ 110. In any event, Walden also asserts that Stencel was "uncomfortable" with her disability, Pl.'s SOF ¶ 8, and sent her a "barrage of emails to distract her" while she attended these appointments, *id.* ¶ 13.

Walden also claims that Stencel told her to "skip" medical appointments "multiple times," and that this happened on "at least ten" occasions. Walden Dep. at 76-77. In particular, Walden cites one incident where Stencel allegedly stated that she should "probably skip" her physical therapy session because a project was due the next day. *Id.* at 78-79. Walden states that "most of the time" she was not able to make up the physical therapy appointments she skipped and was sometimes "charged a fee for not showing up" or "a late fee for arriving there late." *Id.* at 77-78. For her part, Stencel denies ever asking Walden to skip medical appointments and, in fact, claims to have discouraged her from doing so. Stencel Decl. ¶ 113. According to Walden's medical records, during her tenure at PCORI, she missed seven physical therapy sessions (in August and September 2014), at least four of which she appears to have cancelled to complete work assignments. Pl.'s Med. Rec. at 36, 38-39, 41, 43; Def.'s SOF ¶ 32. But Stencel asserts

that, at the time, she was not aware that Walden missed these sessions for that reason.  Stencel Decl. ¶¶ 114-115.

Walden asserts that when she began working at PCORI, the amount of work she was assigned was manageable.  Pl.'s SOF ¶ 5.   But according to PCORI, at that time Walden was assigned discrete tasks that comprised only a subset of her position's full responsibilities.  Def.'s SOF ¶¶ 42-44, 51.  Stencel asserts that she intended to—and did—assign Walden additional responsibilities over time as Walden became more familiar with PCORI.  *Id.* ¶ 44.  One of Walden's job responsibilities was tracking news coverage about PCORI, which the parties call "media monitoring."  *Id.* ¶¶ 14, 48; Walden Dep. at 144.  Around "the July timeframe," Walden received additional media-monitoring tasks that she characterizes as duplicative.  Walden Dep. at 141-142.  For example, Walden asserts that she was asked to track media mentions of PCORI using two different electronic formats.  *Id.* at 142-43.  According to Walden, after she had already completed the assignment in one of the two formats, Stencel said that "it was no longer needed."  *Id.* at 142.

PCORI asserts that Walden did not demonstrate proficiency in the tasks that were assigned to her in her first few months, and that Stencel was dissatisfied with Walden's performance.  Def.'s SOF ¶¶ 45-50.  Stencel often rewrote documents Walden drafted, identified mistakes Walden made, and sent Walden detailed feedback about how to improve.  *Id.*; *see* Stencel Decl., Exs. 2-18, at 17-123.  Nonetheless, Walden asserts that, during this time period, Stencel "on occasion" told her that she "was doing a good job."  Walden Dep. at 189; Pl.'s SOF ¶ 11.  PCORI admits that, throughout the course of her employment, Walden received "some positive comments about her work," but asserts that much of the feedback she received was negative.  Def.'s SOF ¶ 66.

In early October 2014, Walden met with PCORI's Director of Communications, William Silberg, and Director of Human Resources, Mitch Eisman, to voice several concerns, including that Stencel had unduly increased her workload and required her to skip medical commitments. Pl.'s SOF ¶ 13.  Later that month, on October 28, Walden met with Eisman and Stencel to request accommodations for her disability: an arrangement where she could work at home part-time, and an ergonomic chair and standing workstation for her use when she was in the office. Def.'s SOF ¶¶ 33-34; Walden Dep. at 45.  Walden's doctor had recommended that she work at home three days per week for at least eight weeks.  ECF No. 26-4; Pl.'s SOF ¶ 16; Walden Dep. at 45.  Eisman and Stencel agreed to Walden's requests, but authorized her to work at home only two, not three, days per week.  Def.'s SOF ¶ 36.

On November 13, Stencel and Walden discussed the work-at-home arrangement in greater detail.  Id. ¶ 35.  Walden claims that Stencel used this discussion to "interrogate" her and demand that the arrangement include "periodic check-ins."  Opp. at 19-20.  But in any event, the next day, Stencel formally approved the arrangement, and it went into effect three days later. Def.'s SOF ¶¶ 35-36.  The arrangement was originally scheduled to end in January 2015, but PCORI allowed it to continue indefinitely, and it remained in effect until Walden's last day working there in April 2015.  Id. ¶ 37; Walden Dep. at 118.

Once the work-at-home arrangement began, Walden was generally able to attend her physical therapy sessions, which were usually twice per week.  Def.'s SOF ¶¶ 38-39; Pl.'s SOF ¶ 18.  However, Walden alleges that after the meeting to discuss her accommodation, she began receiving an increased workload, including assignments that were duplicative.  Walden Dep. at 139-141.  But, during her deposition, the only example of such duplicative work that she could recall—additional media-monitoring tasks—occurred in the July timeframe.  See id. at 141-42.

At other times, Walden described an increased workload interfering with her medical appointments before her work-at-home arrangement was implemented. *Id.* at 75-77. In addition, she claimed to have discussed her increased workload at the very meeting in which she requested her work-at-home arrangement in October. *Id.* at 105. Again, at least according to PCORI, Walden's increased workload over time was a result of the fact that she was being eased into her job. Def.'s SOF ¶¶ 42-44, 51.

PCORI asserts that, after the work-at-home arrangement began, Walden continued to struggle to complete her work in a timely fashion, and her written work product frequently contained errors. *Id.* ¶¶ 52-55. Walden claims that this criticism was new—a marked contrast to the earlier, positive feedback she had received from Stencel. *See* Pl.'s SOF ¶ 19.

On or about November 25, 2014, one week after the arrangement began, Walden and Stencel met to discuss Stencel's concerns about Walden's performance and Walden's concerns about her workload. Def.'s SOF ¶ 52. Shortly after the meeting, Stencel suggested that they revisit these issues again, once Walden had spent about six months working at PCORI. *Id.* ¶ 54. Although this sort of "six-month review" is not mandatory, PCORI states that its managers are encouraged to conduct them where appropriate. Stencel Decl. ¶ 86.

On January 16, 2015, Stencel conducted Walden's six-month review. Pl.'s SOF ¶ 25. During this discussion, Stencel again stated specific reasons why Walden's performance was lacking, and Walden again expressed concerns about her increased workload. *Id.*; Def.'s SOF ¶ 58. After the discussion, and at Walden's request, Stencel sent Walden a list of specific errors that she had made that month. Def.'s SOF ¶ 60.

On February 26, 2015, Stencel conducted Walden's annual performance review. *Id.* ¶¶ 61-62; Pl.'s SOF ¶ 26. Walden had been working at PCORI for less than a year at that point,

but annual performance reviews for all employees were conducted at around the same time, regardless of the employee's start date. Def.'s SOF ¶ 62. In her evaluation, Stencel rated Walden's performance at 2.19/5.00 (a rating between "Inconsistent" and "Proficient"), and expressed concerns about Walden's time management, the quality of her work product, and the fact that she often left tasks incomplete before taking time off. *Id.* ¶ 63. In contrast, Walden rated her own performance at 3.42/5.00. *Id.*

About a month after receiving her annual evaluation, in mid-March 2015, Walden was placed on a Performance Improvement Plan ("PIP"). *Id.* ¶ 64. The PIP called for Walden to: (1) assume the full responsibilities of her position as Senior Media Relations Specialist; (2) improve her accuracy and eliminate errors in her work product; and (3) improve her time management. *Id.* ¶ 65. In a meeting with Eisman, Stencel, and Silberg to discuss the PIP, Walden claims that Silberg "indicated to Walden . . . that they had 'done enough in providing accommodations for [her] disability.'" Pl.'s SOF ¶ 27. Moreover, Walden claims that Eisman, Stencel, and Silberg all "threatened [her with] termination" if she did not comply with the PIP within four weeks. *Id.*

Soon afterward, on March 25, 2015, Walden resigned. Def.'s SOF ¶ 67. In her resignation letter, Walden accused Stencel of giving her low performance reviews and placing her on a PIP because Stencel "dislike[d] that [she had] a serious medical condition and required accommodations for it." *Id.* ¶¶ 67-68. Upon receiving Walden's email, Stencel immediately forwarded it to Eisman, who tried to speak with Walden about her allegations. *Id.* ¶ 68; Mot. at 27. Walden, however, declined to speak with him. Def.'s SOF ¶ 69. Walden's last day of work at PCORI was April 7, 2015. *Id.* ¶ 70.

During her time at PCORI, Walden took a substantial amount of time off, both for medical and non-medical reasons. *Id.* ¶¶ 26, 28. By her last day at PCORI, she had fully utilized

her accrued PTO and, in fact, had overdrawn her PTO by thirty-four hours. *Id.* ¶ 25. Moreover, aside from Walden's regularly scheduled work-at-home days, she was absent from the office for some or all of the workday for approximately half of the total days she worked at PCORI. *Id.* ¶¶ 26, 31, 40, 41.

After Walden resigned, PCORI posted advertisements for two open positions in the communications department: "Senior Media Relations Specialist" (Walden's former position) and "Media Relations Specialist" (a newly created position). Pl.'s SOF ¶ 28; ECF No. 26-11 at 4-7. Some of Walden's responsibilities as Senior Media Relations Specialist were reassigned to this new position. *Compare* ECF No. 26-11 at 4-7, *with* ECF No. 26-2 ("PCORI Offer Ltr.") at 7-8. PCORI asserts that it created the new position to fully "reduce and eliminate" its reliance on its external communications firm. ECF No. 29 ("Reply") at 18; *see also* Stencel Decl. ¶¶ 12-13, 127.

## B. Procedural Background

Walden filed her complaint on July 1, 2015. Compl. PCORI filed a motion to dismiss on August 18, 2015. ECF No. 8. On March 31, 2016, the Court granted the motion in part and denied it in part, dismissing Walden's hostile-work-environment and constructive-discharge claims but allowing her disparate-treatment and retaliation claims under the DCHRA to move forward. ECF No. 11; *Walden v. PCORI*, 177 F. Supp. 3d 336 (D.D.C. 2016). PCORI answered Walden's complaint on April 18, 2016. ECF No. 15. After the close of discovery, on September 16, 2016, PCORI moved for summary judgment. Mot. On October 14, 2016, Walden filed her opposition to PCORI's motion. Opp. On November 4, 2016, PCORI filed a reply in support of its motion. Reply.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the outcome of the litigation under the relevant substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Once the movant meets its "initial responsibility of informing the district court of the basis for its motion," the non-movant has the "burden to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Grimes v. District of Columbia*, 794 F.3d 83, 94-95 (D.C. Cir. 2015) (internal quotation marks omitted).  "In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true."  *Light v. DOJ*, 968 F. Supp. 2d 11, 22 (D.D.C. 2013) (citing *Liberty Lobby*, 477 U.S. at 255).  However, the non-movant cannot "rely in opposing summary judgment on mere allegations."  *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006).  She must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[I]f the non-movant's evidence is 'merely colorable' or 'not significantly probative,' summary judgment may be granted."  *Bradley v. D.C. Pub. Sch.*, 222 F. Supp. 3d 24, 28 (D.D.C. 2016) (quoting *Liberty Lobby*, 477 U.S. at 249-50).

In addition, where the non-movant bears the burden of proof at trial, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Otherwise, "the plain language of

Rule 56(c) mandates the entry of summary judgment." *Id.* Indeed, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Also, "the non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather, [she] must rely on evidence that would arguably be admissible at trial." *Evans v. Sebelius*, 674 F. Supp. 2d 228, 238 (D.D.C. 2009) (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)).

## III. Analysis

### A. Discrimination (Count I)

The DCHRA forbids covered employers from discriminating against any individual "wholly or partially for a discriminatory reason based upon [an] actual or perceived . . . disability." D.C. Code § 2-1402.11(a).[1] To demonstrate discrimination in violation of the DCHRA, a plaintiff must prove that (1) she had a disability, (2) she was qualified for her position with or without a reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *Giles*, 794 F.3d at 5.

---

[1] The Court looks to case law interpreting federal anti-discrimination statutes when analyzing Walden's claims under the DCHRA. Such claims are "consistently tested using the analytical framework announced in federal court decisions under federal anti-discrimination statutes." *Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213, 247 (D.D.C. 2005). For example, "[w]hen evaluating claims brought under the DCHRA, 'decisions construing the [Americans with Disabilities Act] are considered persuasive.'" *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001)). "[C]ourts [will also] look to Title VII and its jurisprudence" in analyzing DCHRA claims. *Stevens v. Nat'l R.R. Passenger Corp.*, 517 F. Supp. 2d 314, 320 (D.D.C. 2007), *aff'd*, 275 F. App'x 14 (D.C. Cir. 2008); *see Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 18 (D.D.C. 2008) (collecting cases).

In evaluating the third element, where there is no direct evidence of disability discrimination,[2] the Court utilizes the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), to analyze any circumstantial evidence cited by the plaintiff.  *See Giles*, 794 F.3d at 5; *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 571 (D.C. 2000).  Under this framework, the plaintiff bears the initial burden of showing a prima facie case of discrimination.  *Giles*, 794 F.3d at 6 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  If the plaintiff is successful, the burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for the action challenged by the plaintiff.  *Id.*  "If the defendant does so, then the question on summary judgment becomes whether, based on the totality of the parties' evidence, a reasonable jury could determine that the defendant's proffered explanation was pretext for discrimination."  *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 143 (D.D.C. 2016) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494-95 (D.C. Cir. 2008)).

For the reasons stated below, the Court finds that no reasonable jury could find for Walden on her discrimination claim under the DCHRA because she has failed to meet her initial burden of showing a prima facie case of discrimination.  In particular, she has failed to demonstrate that she suffered an adverse employment action.  Moreover, even if she had met her

---

[2] "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*.  Such evidence includes any statement or written document showing a discriminatory motive *on its face*."  *Manuel v. Potter*, 685 F. Supp. 2d 46, 60 n.11 (D.D.C. 2010) (quoting *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006)).  "[D]irect evidence is rare."  *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 9 (D.D.C. 2014) (quoting *Portis v. First Nat. Bank*, 34 F.3d 325, 328 (5th Cir. 1994)).  Walden has failed to provide any direct evidence to show that PCORI discriminated against her on the basis of her disability.  The evidence that she characterizes as "direct," Opp. at 17-18, does not show a discriminatory motive on its face, and is considered alongside her other alleged circumstantial evidence of discrimination, see *infra* Section III.A.2.

burden of demonstrating a prima facie case, no reasonable jury could conclude that PCORI's proffered reasons for its actions were pretext for unlawful discrimination.

### 1. Walden's Prima Facie Case of Disability Discrimination

To make out a prima facie case of disability discrimination, a plaintiff must show that she (1) had a disability within the meaning of the statute; (2) was qualified for the position with or without a reasonable accommodation, and (3) suffered an adverse employment action because of her disability. *Swanks v. WMATA*, 179 F.3d 929, 934 (D.C. Cir. 1999).

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 158 (D.D.C. 2014) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). Such an action must "materially affect . . . the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Id.* (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). "In most circumstances, an adverse employment action will 'inflict direct economic harm,'" such as decreasing an employee's grade or salary. *Id.* (quoting *Burlington Indus.*, 524 U.S. at 762).

"[W]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Otherwise, "[m]inor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like [could] form the basis of a discrimination suit.'" *Id.* (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a 'tangible *change* in the duties or working conditions constituting a material employment disadvantage.'" *Dorns v. Geithner*, 692 F. Supp. 2d 119, 131 (D.D.C. 2010)

(quoting *Walker v. WMATA*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000)). The requirement that an adverse employment action be tangible "guards against 'judicial micromanagement of business practices' and 'frivolous suits over insignificant slights.'" *Id.* at 132 (quoting *Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997), and *Russell*, 257 F.3d at 818).

Notwithstanding this threshold, "a series of independent actions, none of which are adverse actions standing alone, may constitute an adverse action collectively." *Id.* at 134. However, "there is no 'bright line rule' for determining when such impact has occurred." *Id.* (quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 363 (D.D.C. 2007), *aff'd*, 550 F.3d 1191 (D.C. Cir. 2008)). Ultimately, when determining whether individual actions in the aggregate should be considered an adverse employment action, "courts must exercise their judgment carefully on a case-by-case basis." *Baloch*, 517 F. Supp. 2d at 363.

Walden claims, in scattershot fashion, that the following actions taken by PCORI amount to adverse employment actions, either individually or in the aggregate: (1) Stencel "consistently" denying her requests for PTO; (2) Stencel "occasionally" ordering her to "skip" physical therapy sessions; (3) her increased workload; (4) her "preliminary" six-month review and six-month review;[3] (5) her negative annual performance review; (6) her "unfair" performance assessments; and (7) her PIP. Opp. at 16. Even considering all the evidence in the light most favorable to Walden, the Court finds that no reasonable factfinder could conclude that she suffered an adverse

---

[3] Walden refers to the discussion that she had with Stencel on or about November 25, 2014, as a "preliminary" six-month review, Walden Dep. at 117, a characterization that PCORI disputes, Reply at 17 n.15. Both parties agree that the discussion between Walden and Stencel on January 16, 2015, was, in fact, a six-month review. Def.'s SOF ¶ 58; Pl.'s SOF ¶ 25.

employment action. The Court will address each of these potential adverse employment actions in turn.[4]

First, Walden's claim that Stencel "consistently" denied her requests for PTO does not constitute an adverse employment action. *Id.* Walden testified that her PTO requests were denied on "at least a few occasions." Walden Dep. at 28. Significantly, however, Walden does not assert that these denials kept her from ultimately using all the PTO that she accrued, even if she was not able to use it precisely as she preferred. In fact, the uncontroverted documentary evidence shows that, by the time she left her job at PCORI, Walden had used thirty-four *more* PTO hours than she had accrued. Def.'s SOF ¶ 25; ECF No. 23-3 ("Eisman Decl.") at 10-11. Thus, her allegation that she was denied PTO on some occasions, without more, could not have had a materially adverse impact on the terms of her employment. *See Lumpkins-Benford v. Allstate Ins. Co.*, 987 F. Supp. 2d 807, 824 (N.D. Ill. 2013) (finding no adverse employment action where plaintiff claimed she was "denied the privilege of being able to utilize the days in her Paid Time Off Bank whenever and however she [chose]" because she used all the PTO days available to her), *aff'd*, 567 F. App'x 452 (7th Cir. 2014).

---

[4] The Court notes that it disregards the hearsay evidence provided by Walden, as it must. The "general rule is that 'hearsay evidence cannot be considered on a motion for summary judgment.'" *Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11 (D.D.C. 2005) (quoting *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)). In particular, Walden repeatedly refers to an Equal Employment Opportunity Commission ("EEOC") intake file, which was created after she left her job at PCORI, containing the EEOC investigator's notes, Walden's intake questionnaire, and attachments to that questionnaire. ECF No. 26-3. As PCORI points out, this intake file is hearsay that the Court cannot consider. *See EEOC v. Howard Univ.*, 70 F. Supp. 3d 140, 148-49 (D.D.C. 2014) (holding that an EEOC investigator's "unsworn" notes were hearsay); *Fox v. Leland Volunteer Fire/Rescue Dep't, Inc.*, No. 12-cv-354 (LWF), 2015 WL 1058954, at *7-8 (E.D.N.C. Mar. 11, 2015) (concluding that plaintiff's EEOC intake questionnaire was hearsay), *aff'd in part, vacated in part on other grounds*, 648 F. App'x 290 (4th Cir. 2016); *Cruz v. Aramark Servs., Inc.*, 213 F. App'x 329, 332-33 (5th Cir. 2007) (holding "unsworn" statements and letters in plaintiff's EEOC file to be hearsay).

Second, Walden's assertion that Stencel "occasionally" ordered her to "skip" physical therapy sessions does not rise to the level of an adverse employment action. Opp. at 16. Walden testified that she was told by Stencel to skip physical therapy sessions "multiple times," and later clarified that this occurred on "at least ten" occasions. Walden Dep. at 76-77. But she describes only one of those occasions, on which Stencel told her that she should "probably skip" a physical therapy session to finish a project due the next day. *Id.* at 75-76, 79. It is not clear from her testimony how many times she actually heeded Stencel's requests to skip therapy. Walden's uncontroverted medical records show that she missed seven physical therapy sessions (all in August and September 2014) during her almost ten months working at PCORI, although they do not, of course, show what portion of the seven were missed at Stencel's urging. Pl.'s Med. Rec. at 36, 38-39, 41, 43; Def.'s SOF ¶ 32. The documentary evidence also shows that, from June until mid-November 2014, prior to the start of her work-at-home arrangement, Walden attended at least twenty-four physical therapy sessions. Def.'s SOF ¶¶ 29, 31; Pl.'s Med. Rec. at 29, 30, 33-34, 36-39, 41, 43-44. And Walden concedes that, after her work-at-home arrangement began in mid-November 2014, she was generally able to attend her physical therapy sessions through the end of her employment in April 2015. Def.'s SOF ¶¶ 38-39; Pl.'s SOF ¶ 18.

Even viewed in the light most favorable to Walden, this evidence does not demonstrate an adverse employment action. Of course, as a threshold matter, mere *requests* by Stencel to Walden to skip physical therapy—without Walden actually having done so—do not constitute adverse employment actions. Such requests could hardly "materially affect . . . the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Douglas*, 559 F.3d at 552.

Walden's cancellation of seven (or even ten) appointments during her employment at PCORI, even if at Stencel's direction, is simply not significant enough for a reasonable factfinder to consider it a change to the terms and conditions of her employment; it is therefore not material. *See Ramsey v. Moniz*, 75 F. Supp. 3d 29, 54 (D.D.C. 2014) (finding a denial of medical leave on three occasions "was *de minimis* and, consequently, not material"); *see also Dorns*, 692 F. Supp. 2d at 133 ("[E]ven assuming that the denial of . . . sick leave is actionable, the amount in question here is too *de minimis* to be considered 'material' or 'significant.'"). That is especially true here, where Walden has not challenged PCORI's assertion that part of her job required completing assignments "on or before deadlines." Stencel Decl. ¶ 125. Walden herself testified that Stencel asked her to miss physical therapy sessions occasionally in order to meet those deadlines. Walden Dep. at 75-77, 79. That is hardly surprising, and it is consistent with the terms and conditions of Walden's employment, rather than a change to them.

In addition, Walden has also not demonstrated that these cancellations materially affected the terms of her employment by causing her harm. For example, she has not shown, especially in light of the work-at-home arrangement she was subsequently afforded, that missing these appointments caused any setbacks in the rehabilitation of her injuries. *See Gurley v. LaHood*, 504 F. App'x 498, 501 (7th Cir. 2013) (finding a denial of medical leave was not a "significant change in benefits" because plaintiff admitted that his hand was "adequately" treated in the leave he was granted). She does allege that she was sometimes "charged a fee for not showing up" to a physical therapy session or "a late fee for arriving there late." Walden Dep. at 77-78. However, she offers no specifics as to how much the fees were, or how frequently she had to pay them. *Id.* at 77-78. And in any event, such indirect economic harm, unlike "a reduction in salary or

benefits," is not typically a change to terms of employment. *Blackwell*, 61 F. Supp. 3d at 160 (internal quotation marks omitted).

Third, Walden's claim that her workload was increased does not constitute an adverse employment action. Walden asserts that she was given more media-monitoring tasks, and that those tasks were duplicative. Walden Dep. at 144-45. However, according to PCORI's offer of employment dated May 19, 2014, Walden's job responsibilities included "[m]onitor[ing] coverage of PCORI by traditional and new media outlets in both trade and consumer media arenas." PCORI Offer Ltr. at 7. So even by her own account, Walden was merely asked to do more of the same tasks she was already assigned.

Ordinarily, if "not accompanied by some other adverse change in the terms, conditions or privileges of employment," an "increased workload does not constitute an actionable injury." *Mack v. Strauss*, 134 F. Supp. 2d 103, 113 (D.D.C. 2001), *aff'd*, No. 01-5122, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001); *see Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) ("[I]ncreased workload[]" is a "familiar complaint[] in virtually every workplace and every industry," but it does not typically "give rise to a discrimination claim"). Indeed, "courts have recognized that increases in workload or changes in responsibility are not [typically] adverse employment actions, but rather constitute only the ordinary tribulations of the workplace, which employees should expect." *Lester v. Natsios*, 290 F. Supp. 2d 11, 29-30 (D.D.C. 2003) (collecting cases) (internal quotation marks omitted). Here, Walden's vague allegation that some of the media-monitoring work she was asked to do was duplicative does not come close to demonstrating that her increased workload was accompanied by or led to an adverse change, financial or otherwise, in her terms of employment.

Fourth, PCORI's six-month review and preliminary six-month review of Walden's performance are not adverse employment actions. Opp. at 16. Walden claims that these reviews were a departure from the terms of her employment offer letter from PCORI, which she alleges "states that she was subject to an annual review only." *Id.* at 11. But she mischaracterizes the letter, which states merely that "PCORI will conduct formal performance reviews annually," leaving open the possibility of additional reviews. PCORI Offer Ltr. at 5. Thus, these additional reviews were not a material change to the terms of Walden's employment. *See Ransom v. Ctr. For Nonprofit Advancement*, 514 F. Supp. 2d 18, 25-26 (D.D.C. 2007) (employer's nine meetings with plaintiff to review her unsatisfactory job performance did not constitute an adverse employment action); *cf. Hunter v. Clinton*, 653 F. Supp. 2d 115, 122 (D.D.C. 2009) (employer's "increased scrutiny" of plaintiff's work was not an adverse employment action). To the extent that Walden argues her additional reviews were adverse because they were critical of her performance, it is well established (as discussed in greater detail below) that negative performance evaluations are not adverse employment actions. *Donovan*, 559 F.3d at 553.

Fifth, a negative performance evaluation, such as the one that Walden received, Opp. at 16, does not ordinarily constitute an adverse employment action without some link to a tangible economic harm. "There is a 'thick body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions.'" *Dorns*, 692 F. Supp. 2d at 133 (quoting *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999)). The "effect of a poor evaluation is ordinarily too speculative to be actionable." *Donovan*, 559 F.3d at 553. A negative evaluation is not typically considered an adverse employment action "unless [it is] tied to the employee's bonus, or result[s] in some other material employment action." *Turner v. Shinseki*, 824 F. Supp. 2d 99, 116 (D.D.C. 2011); *see also Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C.

Cir. 2002) (noting that "formal criticisms or reprimands without additional disciplinary action" are not adverse employment actions), *but see Russell*, 257 F.3d at 819 (finding an adverse employment action where a lower performance rating led to a reduced bonus).  Because Walden does not claim that her annual performance evaluation resulted in a reduction of her compensation, or otherwise show how the evaluation effected a significant change in her employment status, her negative annual performance evaluation does not qualify as an adverse employment action.

Sixth, the "unfair" informal performance assessments that Walden received did not constitute adverse employment actions.  Opp. at 16.  Walden asserts that Stencel and Silberg, after granting her request for a work-at-home arrangement in October 2014, became "severely critical" of her work and performance.  Pl.'s SOF ¶ 22.  She makes no attempt to explain why she considers this criticism "unfair."  Opp. at 16.  Regardless, like negative performance evaluations, informal criticism is not ordinarily considered an adverse action unless it affects the employee's grade or salary.  *See Burton v. Batista*, 339 F. Supp. 2d 97, 110 (D.D.C. 2004).  "Certainly employers are permitted to criticize an employee's work without giving rise to a . . . cause of action."  *Id.*  Given that Walden does not claim that these "unfair" performance assessments affected her grade or salary, and does not otherwise show a material change in her employment status, they do not amount to adverse employment actions.

Finally, Walden's PIP does not rise to the level of an adverse employment action.  PIPs are not typically adverse employment actions without some additional effect on an employee's grade or salary.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (finding that a PIP was not an adverse employment action because plaintiff did not present evidence suggesting she suffered any significant change in employment status).  Beyond the mere fact that she was placed

on a PIP, Walden claims that Silberg, Stencel, and Eisman all threatened to terminate her if she did not comply with it within four weeks. Pl.'s SOF ¶ 27. And, in fact, Walden's PIP explicitly stated that improvement was expected within four weeks, and that "termination [was] a possible consequence." ECF No. 26-9.[5] But this argument gets Walden no further. It is not uncommon for a PIP to include a warning that non-compliance could lead to termination—but such warnings alone do not give rise to an adverse employment action. *See, e.g.*, *Kelly v. Mills*, 677 F. Supp. 2d 206, 217, 222 (D.D.C. 2010) (no adverse employment action where PIP was accompanied by a letter stating that improvement was necessary in order to avoid "reassignment, reduction in grade or removal from the Federal Service"), *aff'd*, No. 10-5049, 2010 WL 5110238 (D.C. Cir. Dec. 14, 2010). Rather, "placement on the PIP must have *resulted in* an adverse action." *Chowdhury v. Bair*, 604 F. Supp. 2d 90, 96 (D.D.C. 2009). In other words, "an unrealized risk of a future adverse action, even if formalized, is too ephemeral to constitute an adverse employment action." *Russell*, 257 F.3d at 819-20. PCORI's actions did not result in an adverse employment action here, since Walden eventually resigned on her own accord. Def.'s SOF ¶ 67.

In summary, each action challenged by Walden, for reasons discussed above, falls short of an adverse employment action. The Court also concludes that these actions, even if taken together, still do not amount to an adverse employment action. *See, e.g.*, *Dorns*, 692 F. Supp. 2d at 132-34 (finding that refusal of a request for transfer, a poor performance review, a refusal to grant permission to attend training sessions, and a denial of an advancement for sick leave did not, in the aggregate, constitute an adverse employment action); *Brodetski v. Duffey*, 199 F.R.D.

---

[5] Insinuating that her termination was likely, Walden asserts that a colleague from one of her prior jobs told her that "not even the most seasoned media relations professional could overcome [this] PIP." Opp. at 12 (citing Walden Dep. at 150-51). However, the Court cannot credit this statement because it is hearsay. *Greer*, 505 F.3d at 1315.

14, 21 (D.D.C. 2001).  As a result, the Court need not determine whether Walden has met the other elements required for a prima facie case of discrimination.

### 2. Whether PCORI's Stated Reasons for its Actions Were Pretext for Disability Discrimination

Even if Walden had shown that she was subjected to an adverse employment action, she would also have to rebut any legitimate, non-discriminatory reason that PCORI claimed justified its actions.  To do so, she must "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

PCORI argues that Walden performed poorly throughout the course of her employment. Mot. at 16-17.  The uncontroverted record evidence shows that Stencel routinely rewrote documents Walden drafted, pointed out mistakes Walden made, and sent Walden detailed feedback about how she could improve.  Def.'s SOF ¶¶ 45-50; *see* Stencel Decl., Exs. 2-25 at 17-149.  PCORI offers at least sixteen examples, from June (when Walden began work there) through November 2014, where Walden's work product required substantial revisions.  Reply at 20 n.17; *see* Stencel Decl., Exs. 2-18 at 17-123.  PCORI also cites numerous occasions when Stencel gave Walden feedback on her work product or guidance with respect to her job duties. *See, e.g.*, Stencel Decl. ¶¶ 31, 42-43, 52, 59, 74.  Moreover, according to PCORI, Walden struggled with time management, took too long to complete routine tasks, and left projects unfinished before taking PTO or attending her medical appointments.  Mot. at 36; Stencel Decl. ¶¶ 35-36.  Stencel met with Walden on several occasions to discuss how Walden might better manage her time and more effectively perform her duties.  *See, e.g.*, Stencel Decl. ¶¶ 74-76, 93; Eisman Decl. ¶¶ 27, 30.  Yet, according to PCORI, Walden's job performance still did not

improve, resulting in Walden receiving low marks on her annual performance review and, not long afterward, placement on a PIP. Mot. at 36.

PCORI's dissatisfaction with Walden's work is a legitimate and nondiscriminatory reason for many of the actions it took, including conducting Walden's additional performance reviews, giving her a negative annual performance review, and placing her on a PIP. *See Robertson v. Dodaro*, 767 F. Supp. 2d 185, 191-92 (D.D.C. 2011); *see, e.g.*, *Dews-Miller v. Clinton*, 707 F. Supp. 2d 28, 52 (D.D.C. 2010) (holding that supervisors' dissatisfaction with employee's work was a legitimate, nondiscriminatory reason for rating employee as "minimally successful" on her performance evaluations); *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 9 (D.D.C. 2008) (failure "to perform routine duties in a timely fashion" constitutes "a legitimate, non-discriminatory reason for terminating" an employee). PCORI has also offered other legitimate reasons for the other actions it took. For example, PCORI claims that Walden's workload increased only because she was asked to do all the tasks in her job description, not just some of them (as she was allowed to do initially). Stencel Decl. ¶¶ 25-26.

 Because PCORI has provided legitimate, nondiscriminatory reasons for its actions, to survive summary judgment, Walden must "point to facts that would demonstrate that the employer's explanation was not worthy of belief, or there was another, discriminatory motive at work." *Giles v. Transit Employees Credit Union*, 32 F. Supp. 3d 66, 73 (D.D.C. 2014), *aff'd*, 794 F.3d 1 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1171 (2016); *see also Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005).

Walden has not provided sufficient evidence that would allow a reasonable factfinder to conclude that the reasons PCORI offered for its actions were pretext for discrimination. She points to the following: (1) two statements by PCORI that it had "done enough" in providing her

with accommodations for her disability; (2) Stencel's "behavior" during two discussions about her disability; (3) Stencel's denials of PTO requests and orders to "skip PTO;" (4) Stencel's refusal to agree to Walden's request to work at home three days per week; (5) her "substantially increased workload;" (6) Silberg's "behavior" after meeting with Eisman and Walden; (7) her preliminary six-month review and six-month review; and (8) her "unfair performance assessments" after her request for accommodations. Opp. at 17-24. The Court will consider each of Walden's arguments, and the record evidence supporting them, in the light most favorable to her.

First, Walden asserts that in a meeting to discuss her PIP, Silberg told her that PCORI had "done enough in providing accommodations for [her] disability," Pl.'s SOF ¶ 27, and her PIP stated that, "PCORI [had] made every reasonable effort to accommodate [her] requests for an alternative work schedule as well as frequent PTO requests," ECF No. 26-9 at 4; *see also* Opp. at 18. However, these statements—made in the context of evaluating Walden's job performance—merely reflected PCORI's belief that it had provided Walden with the accommodations she had requested in accordance with the law. *See Rashad v. WMATA*, 945 F. Supp. 2d 152, 163 (D.D.C. 2013) (finding that employer's statement that "[d]espite the burden . . . [it] has granted [plaintiff's] accommodation request" did not support claims of discrimination and retaliation). These statements would not permit a reasonable factfinder to conclude that Walden's PIP, or any of PCORI's actions, was the result of discriminatory animus.

Second, Walden claims that Stencel's "behavior" while discussing her disability is evidence of pretext. Opp. at 19. In particular, she asserts that Stencel appeared "uncomfortable" and "squirmish" on two occasions—when she first disclosed her disability and when she requested a work-at-home arrangement. *Id.*; Walden Dep. at 97-100. However, Walden's

"subjective belief" that Stencel's "body language communicated discriminatory intent . . . is not sufficient to overcome summary judgment." *Yue Yu v. McGrath*, 597 F. App'x 62, 67 (3d Cir. 2014); *see also Johnson v. Perez*, 66 F. Supp. 3d 30, 42 (D.D.C. 2014) (finding no evidence of pretext where employer was purportedly "tense and uncomfortable" around plaintiff, who was black, but not around her white co-workers), *aff'd*, No. 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015).

Third, Walden claims that Stencel "at times denied and ordered Walden to 'skip' PTO." Opp. at 19. But there is nothing about this allegation that a reasonable factfinder could find demonstrates discriminatory pretext. In terms of her PTO use, as already discussed, the evidence shows that Walden was permitted to use thirty-four more PTO hours than she actually accrued. Def.'s SOF ¶ 25; Eisman Decl. at 10-11. Moreover, Stencel's denial of Walden's PTO request in December 2014 (the only denial of her PTO that Walden identifies with specificity) is wholly unconnected to Walden's disability; that request was apparently for a vacation, not for a physical therapy appointment. Walden Dep. at 160-61.

To the extent that Walden suggests that Stencel's telling her to skip her medical appointments (whether or not she had to use PTO to attend them) was a pretext for disability discrimination, Opp. at 19, she stands on even weaker ground. Walden herself testified that Stencel's actions in this regard were not motivated by disability discrimination. She testified that Stencel generally told her to "skip" physical therapy for work-related reasons, such as the completion of "priority assignments." Walden Dep. at 75-77. For example, on the one occasion she described, Stencel told her that she should "probably skip" her physical therapy session "because this [project] is something that's due tomorrow." *Id.* at 78-79. Walden has not called into question PCORI's evidence showing that her job required her to meet these deadlines.

Stencel Decl. ¶ 125. Accordingly, on this record, a reasonable factfinder could not conclude that Stencel's alleged requests for Walden to miss these physical therapy appointments give rise to an inference that PCORI was motivated by discriminatory animus.

Fourth, Walden points to the way in which PCORI accommodated her disability as evidence of pretext. Opp. at 19-20. As mentioned above, PCORI granted Walden's request for an ergonomic chair and a standing workstation. Def.'s SOF ¶¶ 33-34; Walden Dep. at 45. And for purposes of the work-at-home arrangement, Stencel permitted Walden to work at home two days per week, rather than the three days per week that her doctor recommended. Def.'s SOF ¶ 36. This accommodation is plainly not evidence from which a reasonable factfinder could conclude that PCORI's actions were pretext for discrimination. *See, e.g.*, *Swann v. Office of Architect of Capitol*, 73 F. Supp. 3d 20, 30-31 (D.D.C. 2014) (finding that employer's decision to place a lock on a unisex locker room, in place of providing the separate female locker room requested by plaintiff, could not be considered pretext evidence for discrimination or retaliation), *aff'd*, No. 15-5001, 2015 WL 5210251 (D.C. Cir. Aug. 18, 2015). In fact, as already described, PCORI's accommodation was in some ways more generous than what was recommended by Walden's doctor. The doctor recommended that the arrangement last eight weeks, yet PCORI allowed it to continue for approximately five months, up until Walden's last day working there. Def.'s SOF ¶¶ 36-37.

Walden also asserts that Stencel endorsed this work-at-home arrangement only after "interrogating" Walden and insisting that the arrangement be accompanied by "periodic check-ins." Opp. at 20. She suggests that this is a "departure from established procedures," which can be probative of a pretext for discrimination, *Allen v. Johnson*, 795 F.3d 34, 45 (D.C. Cir. 2015), but she utterly fails to produce evidence of what those procedures were. For its part, PCORI

asserts that holding such discussions preceding the establishment of a work-at-home arrangement, and having "periodic check-ins," are standard protocol. Reply at 16. PCORI's claim finds confirmation in the agreement memorializing Walden's arrangement, which specifically states that "[t]he most successful flexible work arrangements occur when the manager and employee discuss and work through the details of the proposed arrangement in advance." Stencel Decl., Ex. 42 at 241. It also states that the "employee's role" is to "[r]egularly evaluate the arrangement with [his or her] supervisor and implement agreed upon changes." *Id.* at 240. In the end, of course, Stencel approved the work-at-home arrangement. Def.'s SOF ¶¶ 35-36. There is simply no basis here from which a reasonable factfinder could conclude that PCORI's actions were pretexts for discrimination.

Fifth, Walden claims that, after she had requested a work-at-home arrangement, she was given a "substantially increased" workload that "one person could not handle." Opp. at 20. She asserts that this increased workload included additional media-monitoring tasks, and that such tasks were duplicative. Walden Dep. at 143. To demonstrate that this added workload was overly burdensome, Walden points to the fact that, shortly after her departure, PCORI created a second position to assume several of the responsibilities originally assigned to Walden's position. Opp. at 22-24. For its part, PCORI responds that the new position was created to account for the additional work PCORI would take on to fully "reduce and eliminate" its reliance on its external communications firm. Reply at 18; Stencel Decl. ¶¶ 12-13, 127.

With respect to a pretext analysis, Walden fails to show how her allegations of increased workload—which she describes only in the most opaque way—suggest that PCORI was motivated by discriminatory animus. The only example of increased workload that Walden described involved performing media-monitoring tasks that were included in the description of

her job when she applied for it. Walden Dep. at 141-42, 144. Simply put, she provides no evidence that would cast doubt on PCORI's explanations for (1) her increased workload (that she was given additional media-monitoring assignments over time because she had been performing only a fraction of her assigned duties), or (2) the creation of a new position after she resigned (to fully eliminate its reliance on an external communications firm).

To the extent that Walden argues that the timing of this increased workload is significant, "[t]iming standing alone is not sufficient absent other evidence of pretext." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) (quoting *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998)). Moreover, Walden disclosed her disability to PCORI immediately after the start of her employment in June. Walden Dep. at 43-44. So there is little, if any, temporal link between PCORI's knowledge of her disability and Walden's allegation of increased workload after she requested a work-at-home arrangement in late October.

In fact, the evidence does not even support Walden's claim that she received an increased workload only after requesting a work-at-home arrangement. Opp. at 20-21. She did make this claim at one point during her deposition. Walden Dep. at 139-141. But the only specific example of her increased workload she recalled—the duplicative media-monitoring tasks— occurred in the "July timeframe." *Id.* at 142. At other times, Walden described an increased workload interfering with her medical appointments *before* her work-at-home arrangement was implemented. *Id.* at 75-77. In fact, she claims to have discussed her increased workload at the very October meeting she now claims precipitated her increased workload. *Id.* at 105. Taken as a whole, her testimony is broadly consistent with PCORI's assertions that her workload was increased gradually over time, to permit her to learn about PCORI. There is simply no basis to

conclude that the timing of her increased workload in relation to her request for a work-at-home arrangement suggests discrimination.

Sixth, Walden claims that Silberg's "behavior" after she met with him and Eisman in early October 2014 is evidence of a discriminatory motive. Opp. at 21. Walden asserts that she voiced concerns about Stencel at the meeting; in particular, she relayed that Stencel had increased her workload and required her to skip medical appointments. Pl.'s SOF ¶ 13. But there is nothing about Silberg's subsequent conduct from which a reasonable juror could infer discriminatory intent. Walden points to two instances that took place after the meeting—one where Silberg revised her draft "media update," Stencel Decl., Ex. 15 at 108-11, and another where Silberg stated that Walden had circulated the wrong draft "e-alert," Stencel Decl., Ex. 18 at 119-23. *See* Opp. at 10. But Silberg had revised Walden's written work prior to the meeting as well. Stencel Decl., Ex. 8 at 73-75. That is hardly surprising: Silberg was the head of PCORI's communications department. Therefore, Silberg's supposedly improper "behavior" consisted merely of doing his job.

Seventh, Walden asserts that she was subjected to a preliminary six-month review and six-month review that no other employees were required to undergo. Opp. at 21-22. A "departure from established procedures" can be probative of a pretext for discrimination, *Allen*, 795 F.3d at 45, but on the record here no reasonable factfinder could conclude that such a departure occurred. Walden claims that her employment offer letter from PCORI states that she was only subject to an annual review. Opp. at 21. But, as already discussed, the letter merely states that annual reviews will be conducted, leaving open the possibility of additional performance reviews. PCORI Offer Ltr. at 5. Walden's only other evidence showing a departure from established procedures is her own statement that certain unnamed colleagues had

"never heard of a 6-month review, only an annual review." ECF No. 26-7 at 5. However, this evidence cannot be credited at summary judgment because it is hearsay. *Greer*, 505 F.3d at 1315; *see Hernandez v. Pritzker*, 741 F.3d 129, 134 (D.C. Cir. 2013) (finding plaintiff's "own statement claiming two colleagues told her about the openings" to be "'pure hearsay'" that "counts for nothing in an opposition to summary judgment" (internal quotation marks omitted)). Of course, Walden could have deposed the colleagues who had "never heard of a 6-month review," but she declined to do so. *See Carter v. George Wash. Univ.*, 387 F.3d 872, 880 (D.C. Cir. 2004) (at summary judgment, no need to consider plaintiff's inadmissible hearsay evidence regarding a committee's interview of candidates other than plaintiff where she did not depose any of the committee members or candidates).

Finally, Walden claims that Stencel became dissatisfied with her work only after Walden met with Eisman and Silberg in early October 2014. Opp. at 24. Walden states that, after this meeting, Stencel "became severely critical" of her work and gave her "unfair" evaluations. *Id.* at 21-22. According to Walden, before that time, PCORI was satisfied with her job performance. Walden Dep. at 193. She asserts, and PCORI admits, that Stencel occasionally praised Walden's work during her tenure at the organization. Opp. at 24; Def.'s SOF ¶ 66.[6]

In response, PCORI provides "uncontradicted evidence in the record that [it] harbored concerns about the quality of [Walden's] performance" both before and after the October

---

[6] Walden also claims that "the in-house editorial team would get back to her with minimal to no edits." Pl.'s SOF ¶ 21; Walden Dep. at 158-59. This evidence is not probative of pretext because Walden reported only to Stencel and (on occasion) Silberg, not to anyone on the in-house editorial team. "[I]t is the supervisor's perception of the employee that is relevant, not the perceptions of his coworkers." *Mastrangelo v. Nat'l R.R. Passenger Corp.*, No. 01-cv-0582 (TFH), 2006 WL 416181, at *7 (D.D.C. Feb. 22, 2006); *see also Gonda v. Donahoe*, 79 F. Supp. 3d 284, 299 (D.D.C. 2015) ("[C]oworkers' beliefs about a plaintiff's work performance are anecdotal opinions without weight.").

meeting. *Glass v. Lahood*, 786 F. Supp. 2d 189, 215 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011). PCORI points to numerous examples, from June through early October 2014, where Stencel rewrote Walden's work or identified mistakes that Walden had made. Def.'s SOF ¶¶ 45-50; *see* Stencel Decl., Exs. 2-13, at 17-105. Both parties agree that Stencel was critical of Walden's work after the October meeting, and that Walden received low marks on her annual performance review and was subsequently given a PIP. *See* Mot. at 36; Opp. at 21. Even viewing this record in the light most favorable to Walden, the evidence simply does not support her claim that PCORI became dissatisfied with her work only after Walden met with Eisman and Silberg in early October 2014. The record is replete with documentary evidence showing Walden's performance deficiencies before October, none of which she specifically contests.

In the end, none of the evidence Walden cites suggests that PCORI's stated reasons for its actions—in particular, its dissatisfaction with her work—were pretext for disability discrimination. She has not, for example, contravened the specific evidence documenting PCORI's concerns. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (plaintiff failed to show pretext where she "did not contravene—and in fact admitted—many of the deficiencies the defendants cited concerning her performance"). Although Stencel may have occasionally praised Walden's work, "[i]nstances of positive feedback do not suggest pretext" where there is "substantial evidence that her superiors were dissatisfied with her work performance and her failure to improve." *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 299 (D.D.C. 2015). And there is nothing in the record to suggest that PCORI did not honestly believe in its negative assessment of Walden's work performance. *See Brady*, 520 F.3d at 496. As is the case here, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the

evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* at 495.

Therefore, even if Walden had shown that she was subjected to an adverse employment action, she has provided no basis for a reasonable factfinder to conclude that the reasons PCORI gave for its actions were pretext for disability discrimination. As a result, Walden's discrimination claim under the DCHRA cannot survive summary judgment.

### B.    Retaliation (Count II)

Under the DCHRA, covered employers may not "coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61. A prima facie case of retaliation requires a plaintiff to show, "first, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity." *Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006) (quoting *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005)).[7] If a plaintiff meets that burden, the burden shifts to the defendant to articulate a legitimate and nondiscriminatory reason for the adverse employment action. *See Siddique v. Macy's*, 923 F. Supp. 2d 97, 107 (D.D.C. 2013) (citing *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010)). If such a reason is articulated, the Court considers "whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (quoting *Gaujacq*, 601 F.3d at 577).

---

[7] "A DCHRA retaliation claim effectively mirrors . . . a claim 'under the federal employment discrimination laws.'" *Lewis v. Gov't of D.C.*, 161 F. Supp. 3d 15, 34 (D.D.C. 2015) (quoting *McCain v. CCA of Tenn., Inc.*, 254 F. Supp. 2d 115, 124 (D.D.C. 2003)).

Even assuming that Walden has made out a prima facie case here, the Court finds that no reasonable jury could infer that she was retaliated against from the evidence in the record. With respect to Walden's retaliation claim, PCORI offers the same legitimate, nondiscriminatory reasons for its actions as it did in connection with her discrimination claim: mainly, that Walden performed poorly throughout the course of her employment. And in support of her retaliation claim, Walden relies almost exclusively on the same evidence that she proffered to show pretext in connection with her discrimination claim. Opp. at 29-30. Here too, and for the same reasons already discussed in the discrimination context, the Court finds that Walden fails to create a material dispute as to whether PCORI retaliated against her. *See supra* Section III.A.2.

Walden offers one new argument, but it adds little to her case. She asserts that her "wealth of experience at major companies and government organizations [was] recognized by PCORI before she started at the organization." Opp. at 29. However, a "plaintiff's subjective assessment of her own qualifications . . . cannot serve to establish pretext under the law." *Young v. Perry*, 457 F. Supp. 2d 13, 19 (D.D.C. 2006).

In light of all of the evidence, the Court also concludes that no reasonable factfinder could find for Walden on her DCHRA retaliation claim. Therefore, PCORI is entitled to summary judgment on it, as well.

## IV.    Conclusion

For the foregoing reasons, PCORI's motion for summary judgment will be **GRANTED**, and the Court will enter judgment in its favor, in a separate order.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 30, 2018